J. Tunkie Saunders

*v.*

State of Tennessee.

(*Nashville,* December Term, 1960.)

Opinion filed March 10, 1961.

Lucius E. Burch, Jr., Memphis, for plaintiff in error.

Walker T. Tipton, Assistant Attorney General, for the State.

Mr. Justice Burnett delivered the opinion of the Court.

Saunders was charged in a presentment of the Grand Jury with an assault with intent to commit murder in the first degree. He was convicted of assault and battery with sentence of six months in the County Workhouse and a fine of $500. This judgment has been seasonably appealed to this Court. Able briefs have been filed, arguments heard, and we now, after a careful reading of the record, the briefs, the authorities therein cited, and making an independent investigation, have the question for determination.

The occurrence out of which this presentment arose occurred in Memphis on January 12, 1959, at the home of the plaintiff in error. On this day, which was Monday, the plaintiff in error had invited two ladies and a gentleman friend of his to his home for lunch. The group gathered at the home of the plaintiff in error around 1:00 o'clock and spent some two or three hours prior to their lunch, which was served about 3:00 o'clock, having cocktails and discussing literature.

Just about lunch time, or around 3:00 o'clock, the defendant got a .20-gauge gun of his, brought it to the downstairs of his home in preparation to loaning it to the gentleman friend who was visiting, and in preparation to showing him how it operated the gun inadventently

fired into the floor of the house which was slate and the pellets ricocheted off the wall. There was no further handling of this gun until the events out of which this presentment arose. Sometime during the afternoon, and after the lunch, the plaintiff in error phoned a lawyer friend of his in Memphis. At the time this call was made this lawyer was out of his office, but upon his return, shortly before 5:00 o'clock, he returned the call to the plaintiff in error. The plaintiff in error then invited this lawyer to come by his home for cocktails. This lawyer came to the home of the plaintiff in error about 5:00 o'clock in the afternoon, parked his car on the street and walked up to the defendant's home and went in the house without knocking, the door apparently being open or ajar.

Upon entering the home of the plaintiff in error the lawyer was standing in the entrance hall to the right of which is located the dining room and to the left of which is located the living room. This lawyer went directly into the dining room and spoke to one of the ladies, Mrs. Leatherman, and to the gentleman friend, Mr. Richardson, who were visiting the plaintiff in error. These parties were sitting at the dining room table. After conversing with them for some fifteen to twenty minutes, the lawyer, Mr. Alexander, walked across the hall to the entrance of the living room to speak to the plaintiff in error and the lady, Mrs. Smith, who were seated on the sofa talking.

When Mr. Alexander entered the living room, the plaintiff in error jumped up from his seat and rushed upstairs and mumbled something about "shoot". About this time, Mrs. Leatherman rushed into the living room from the dining room and said, "Let's get out of here, Tunkie is crazy and is going to shoot someone." The two ladies then left the house and ran, or walked very fast, to Mrs.

Leatherman's car. Mr. Alexander followed immediately behind them and was proceeding to his car, which he said was about forty to fifty feet from the house, when the defendant fired a .20-gauge shotgun twice from a second story window. The distance from the house to Mr. Alexander's car is disputed in the record, and according to the evidence of the plaintiff in error instead of being some forty to fifty feet was some forty-three paces away from the house. Be this as it may, this is a disputed question with the statements of the two parties as to the distance being an estimate on the part of Mr. Alexander and being a measurement on behalf of the plaintiff in error. Pictures of the location of the house and its distance from the street are in the evidence, and as to how far this was, was a question for the jury under all the facts and circumstances.

Nineteen shot from the second blast of this .20-gauge shotgun, which was loaded with skeet shot or number 9's, struck Mr. Alexander about the neck and shoulders. Three holes from these shots were drilled through the brim of his hat, and one through the crown. As he was hit by these shots Mr. Alexander turned and called the defendant "a fool" or something similar, got in his car, and drove to the home of one of the ladies who was present.

Shortly after he had gotten to the home of this lady, due to the fact that his neck was bleeding slightly where he had been struck, he decided it was best to call a doctor. Then after some discussion it was decided it was best to go to the doctor's office for a tetanus shot which had been advised by the doctor. As Mr. Alexander and Mrs. Leatherman were leaving this home to go to the doctor's office, the plaintiff in error and the gentleman friend, who

had been at his home for lunch, arrived at the home. After some little conversation between those present, it was noticed that the plaintiff in error had his hands in the pockets of his topcoat. During the conversation there (there being no words passed between Mr. Alexander and the defendant) somebody asked Mr. Saunders, plaintiff in error, what was going on and he made the statement, "I shot him." As just said, he had his hands down in his topcoat pockets and according to Mr. Alexander, "As I was leaving to go over to Dr. Taylor's, Dr. Taylor having previously left, I asked him if he had a gun in his pocket and he said he did." In the testimony herein of Mr. Saunders, the plaintiff in error, he admits making such a statement but says that he didn't have a gun and he only made it in a joking and playful manner. Be this as it may, the jury in this case had both Mr. Alexander and the plaintiff in error before them, heard their testimony as to how and what occurred. It was up to the jury to conclude from these statements the effect thereof.

No report was made to the authorities with reference to this occurrence because apparently for fear of unfavorable publicity towards the parties present. But such things have a way of cropping out and obviously when they are tried to be covered up they gain momentum and proportions. Through one way or another various rumors and statements as to what went on occurred in the local press. As a result of this the Attorney General's office made an investigation and from this investigation the presentment herein upon which this conviction was based was born.

Of course, the effect of finding the plaintiff in error guilty of assault and battery only was to acquit him of

the felony or more serious charges in the presentment. *Reagan v. State,* 155 Tenn. 397, 293 S.W. 755; *Asbury v. State,* 178 Tenn. 43, 154 S.W.2d 794.

 Ordinarily intent to injure is the gist of an assault. *Richels v. State,* 33 Tenn. 606. A specific intent though to do an injury is not necessary to constitute assault and battery where the act complained of is *malum in se* but general malevolence or recklessness will suffice. *King v. State,* 157 Tenn. 635, 11 S.W.2d 904, 905. In the King case, this Court quoted with approval Clark & Marshall on Crimes, as follows:

"While there is very little authority on the question, there seems to be no good reason to doubt that a person may be guilty of criminal assault and battery if he intentionally does an act which, by reason of its wanton and grossly negligent character, exposes another to personal injury, and does in fact cause such injury. Throwing a stone in sport and striking another is an assault and battery.

"If a personal injury is unintentionally done another by one who is engaged in an unlawful act, he is not necessarily excused on the ground of accident. If the act is a crime and *malum in se,* and the injury is a natural or probable consequence of the act, he is guilty of assault and battery. Thus, if one strikes at one person and unintentionally injures another, he is guilty of assault and battery upon the person injured. It is not even necessary that there shall be an intent to injure any particular person. If one throws a firecracker or shoots into a crowd, and injures any one of the crowd, it is an assault and battery."

The above quotations as approved by this Court clearly apply to the factual situation herein as will be more specifically hereinafter related.

In 1882, this Court in *Cowley v. State,* 78 Tenn. 282, at page 284, adopted the principles above quoted, citing a number of authorities to sustain the proposition.

■ The basic contention on this appeal is that there is no evidence of any intent to do injury. The intent necessary to constitute assault and battery is either an express desire upon the part of the accused to inflict the injury or it can be supplied as a matter of law from doing an act in such a reckless and wanton manner that the natural and probable results thereof will be to inflict an injury. The factual situation as presented in each case is a question for the jury to determine whether or not there is either an express desire, or from the acts within themselves the intent is shown.

In this case the record shows that the plaintiff in error intentionally fired a shotgun twice and that the second blast struck Mr. Alexander. The plaintiff in error says that he did not intend to kill Mr. Alexander or anything of the kind, because if he had intended to do so he was an excellent shot and would have used a pistol or something of the kind to shoot with. He says though that he was in an "abandoned mood" and he likewise says, "Well, I said, 'Well, if he is going to act that way, I'll just fire a couple of shots.' " He likewise says, "Evidently I wasn't thinking much at all, or I wouldn't have shot." His, that is the plaintiff in error's, account of his own feelings when he went upstairs to quote him was: "The girls were putting on their coats and I said, 'Well, why are you taking such a blue-nosed attitude about my

gun going off in the floor?' or something to that effect.''
According to the testimony in the record they had been
at this home for some four hours prior to this shooting
and in the meantime the plaintiff in error, according to
his admission, had had at least four drinks. He says
that he was not intoxicated or drunk. Mrs. Leatherman
in her testimony says that they had tried to get Mr.
Saunders to come on and eat his lunch when the others
were eating but that he would not do so. Mr. Saunders
says that he ate sweetrolls and drank coffee before he
left the office about 11:30 that morning. There is also
evidence in the record that when Mrs. Leatherman asked
him to come on and eat he said that he had eaten much
earlier.

There is also evidence in the record that in December
prior to this shooting the plaintiff in error had taken one
of the ladies who was in the house to a dance and that this
lady was dancing with Mr. Alexander, the man who was
shot, while the plaintiff in error was scowling and
seemed to be displeased about this lady dancing with Mr.
Alexander. He was asked about this and said that his
only reason for scowling or being a little out of sorts was
the fact that he wanted to go home, and that when he
wanted to go home he went. Be this as it may, it was
a question for the jury to determine under all these facts,
the way the plaintiff in error left when Mr. Alexander
entered the house and the shooting which followed in a
matter of minutes after Mr. Alexander had first entered
the house and come into the room where this lady he had
been dancing with in December and the friend of the
plaintiff in error was, and the statements about the mat-
ter of whether or not he was intoxicated, how many
drinks he had had and his attitude. This was a question

for the jury to determine whether or not this drinking and these things had affected his thinking to the point where he could not rationally think. The jury certainly could have arrived at the conclusion from this state of facts that the plaintiff in error was in such a state of intoxication from drinking that he was thus deprived of his sense of discretion and in this condition to use a gun as he did which can be very dangerous to life and limb constituted not merely negligence but an act of *malum in se.*

It must be remembered that we of the appellate court view the record as it now stands with a presumption of guilt and with the burden on the plaintiff in error to show that his position factually is shown by a preponderance of the evidence in the record. In this consideration of the case it is our duty to view the record as it could have been viewed by the jury from the evidence introduced. This Court applies the rule that the credibility of witnesses and conflicts in testimony have all been settled by the verdict of the jury. *Cooper v. State,* 123 Tenn. 37, 138 S.W. 826, and many subsequent cases.

The jury, reaching its conclusion herein under the rules stated in the last paragraph, had the right to and should take into consideration any evidence of ill feeling, unfriendly relations, and words between the accused and Mr. Alexander of any offense, and evidence concerning the conduct and sayings of the accused shortly before and after the offense was committed. When we thus view the situation from what has been hereinbefore detailed as to the factual situation as to how this offense occurred we can readily see why and how the jury concluded as it did. In so concluding the jury under this factual situation

must have concluded that this shooting took place from a state of intoxication of the plaintiff in error which affected his judgment to such an extent that he used a shotgun maybe not for the purpose of killing the person but at least where it could have been extremely injurious to the person, for if Mr. Alexander had happened to turn around immediately before the second shot to see what was happening and if these shots had hit him in the face and eyes it could have caused blindness.

The court judicially know that a pistol or a shotgun fired at short range, when used to injure a person, is a deadly weapon. When a shotgun is thus used, which could be injurious to life, the malice is rebuttably presumed by the intentional use of such a weapon. *Wright v. State,* 17 Tenn. 342.

From what we have said above and from the record herein we have concluded that the unlawful acts committed by the plaintiff in error herein were *malum in se* and not merely acts *malum prohibitum* as is contended by the plaintiff in error. In consideration of the two types of unlawful acts the factual situation herein is very analogous to the factual situation created by the numerous cases of this Court wherein death and serious bodily injury have been inflicted by the use of an automobile. The basis for these two types of injury were probably first set forth (*malum in se*) in *Keller v. State,* 155 Tenn. 633, 299 S.W. 803, 59 A.L.R. 885, while that of *malum prohibitum* was first set forth in *Copeland v. State,* 154 Tenn. 7, 285 S.W. 565, 49 A.L.R. 605. Since the time of these cases there are literally dozens of reported cases in this State determined upon the factual situation of each case as to whether or not it falls within the one class or the other. The statements made in this type of case could

very easily by analogy be made in this case. In those cases a sound expression of the rule of law which controls cases involving criminal negligence with an automobile was made by this Court in *Potter v. State,* 174 Tenn. 118, 127, 124 S.W.2d 232, 236, thus:

"The test appears to be whether or not the driver, violating the highway statute in the particular above considered, does so consciously, or under circumstances which would charge a reasonably prudent person with appreciation of the fact and the anticipation of consequences injurious or fatal to others."

Taking this statement of the law in reference to an automobile it is clearly applicable to the use of a shotgun as herein used. Clearly from the statements of the plaintiff in error himself the use of the shotgun was not by misadventure or accident but was intentionally done by him as quoted from his statements above. He was clearly guilty of more than civil negligence. Acts of the kind that were done by the plaintiff in error herein supply the criminal intent necessary to render one punishable for his conduct, because the natural or probable result of such shooting might have been very injurious.

The jury, as said before, were well warranted under this record in concluding the plaintiff in error was under the influence of an intoxicant to such an extent that he was not capable of using a sound and discreet judgment that is necessary in the use of firearms of the kind. When firearms are thus in the hands of one so intoxicated by his on desire they become "an instrumentality fraught with danger to others, and [a] careful handling of such an instrumentality is essential to the public safety. It is highly criminal and perilous to life and property for those

under the influence of an intoxicant to such an extent 'as to deprive them of their sense of discretion,' * * *'' *Keller v. State,* supra [155 Tenn. 633, 299 S.W. 804], to use such an instrumentality as the plaintiff in error had here.

There have been twenty-five errors assigned in this case. Each of them was excellently briefed, ably argued and presented herein. We though after carefully reading this record, briefs and authorities, some of them twice, have concluded that it is not necessary for us to take up each assignment seriatim and reply thereto, because from what we have heretofore said and what we will hereinafter say we have concluded this is a complete answer to any possible questionable error that could have been committed herein.

 The plaintiff in error assigns a portion of the judge's charge as error wherein the court charged:

"If you believe the theory of the defendant or find from all the proof in the case that the State has failed to prove him guilty beyond a reasonable doubt to any one of the assaults with intent to commit felonious homicides or misdemeanors embraced in the Presentment, it is your duty to acquit the defendant."

This Court had before it an identical question in *Rosenthal v. State,* 200 Tenn. 178, 292 S.W.2d 1, where it was answered by Mr. Justice Swepston of this Court at pages 188 and 189 of 200 Tenn., at pages 5 and 6 of 292 S.W.2d. That same answer is equally applicable here. We think that any misapplication of the word "or" rather than the word "and" is at the most harmless error because the jury in this same sentence is told that if they have a reasonable doubt as to his guilt they must acquit him.

We see no error herein when the charge is read considering the whole charge of the court.

In our commenting on the whole charge, we think that unquestionably the charge as a whole sufficiently covers the law in an understandable way to the jury. At a point in the charge the District Attorney General called a question to the court's attention that had been charged and then there was considerable colloquy between the counsel for the plaintiff in error and the District Attorney General and the court, and then the charge was concluded. The judge was very careful in giving this charge. As we read the whole charge even in view of the attacks made on certain portions by counsel and special requests as given, we can find no reversible error therein. We think that the charge above copied, even though not in the language as approved in *Frazier v. State,* 117 Tenn. 430, 100 S.W. 94, which is one of the authorities relied on by the plaintiff in error, at least gives to the jury the same meaning as the correct charge set out in the Frazier case.

A number of the assignments are addressed to the refusal of the trial court to give certain special instructions, to-wit, 15, 16, 17, 18 and 20. These special requests deal with the criminal liability of one for his acts in the absence of specific malice or intent. We have heretofore outlined what we understand the law to be under such a situation as applied to the facts herein. There is running through these special requests specific legal definitions of the acts of *malum in se* and *malum prohibitum* and the distinction between them. The charge of the trial court to the jury sets these things out sufficiently in law without a dictionary definition thereof to

such an extent that there is certainly, to our mind, no reversible error in refusing such requests.

It is claimed very vigorously that the trial judge did not fairly charge the theory of the case as far as the plaintiff in error was concerned and refused a special request on the subject of good moral character. After a careful reading, as said above, of this charge we think after analyzing and studying this record that the theory of the plaintiff in error was very carefully explained to the jury by the trial judge and his charge on the moral character of the plaintiff in error and its effect was thoroughly covered, beginning at the last sentence on the bottom of page 417 of the record. This charge complies with the law thereon. There are other places in the charge where the question is touched on, especially along with that portion of the charge on reasonable doubt. All these things taken into consideration clearly do not injure the plaintiff in error.

An assignment is made, and very able argument made, that it was error for the trial judge to sustain the exception of the State when counsel for the plaintiff in error attempted to cross-examine Mr. Alexander as to the apology made by the plaintiff in error to Mr. Alexander's wife. This was not allowed because anything Mr. Alexander said about it would be heresay. Clearly this was not error. When the plaintiff in error took the witness stand he testified at length as to the apology that he had made to Mrs. Alexander as well as to Mr. Alexander's mother. When the matter is viewed in this light there can be no error on this question.

Now again going back to the factual situation as attempted to be outlined in the beginning of this opinion,

this assignment brings another question to our mind, that is, the effect of the failure of the plaintiff in error to at any time apologize to Mr. Alexander for having fired these two shots. The record shows that he never apologized to the intended victim, and from his testimony it is clearly inferable that he never intends to and there must be some reason in the back of his mind why he would not. All of this the jury had before it. They saw these witnesses, and heard these things, and they had the right to base any reasonable inference thereon. In the argument of the question on the failure to apologize counsel for the plaintiff in error made a very apt statement as to what the jury could conclude from no apology having been made by the plaintiff in error to Mr. Alexander when he said that the jury could have concluded, or that it could be concluded, that there was ''a non-repentant and belligerent state of mind on the part of Mr. Saunders''. In other words that this showed a non-repentant state of mind on the part of Mr. Saunders. We think unquestionably that it could be concluded, and his attitude certainly convinces us of the truth of this conclusion. This, too, was taken into consideration by the jury in considering other facts hereinbefore related.

Objection is made to certain portions of the argument of the District Attorney General to the jury. The arguments of counsel are preserved in the record and have been read by us with a great deal of interest. Frankly, we see nothing wrong in the argument. It was a natural and proper thing for a good advocate to make under the proven facts and the necessary inferences to be drawn therefrom. We see no error in the argument even if it had been called to the attention of the trial judge at the time, to have made it reversible error.

Lastly, some three or four assignments are addressed to the court's refusal to give other requested charges, which did not allow the plaintiff in error to read from portions of certain law books and some of these assignments likewise go to the failure of the court to allow this to be done. A very plausible argument is made by the plaintiff in error that since under our constitution the jury is the judge of both the law and the facts that then the court should allow the reading of the law from various law books, treaties and reported opinions on the questions to the jury. As authority for this proposition the case of *Hannah v. State,* 79 Tenn. 201, is cited. This opinion clearly holds that and holds that it is reversible error not to permit the reading to the jury from such books. In a later case, just prior to the turn of the century, *Ford v. State,* 101 Tenn. 454, 47 S.W. 703, 705, the Court again said, ''Under our practice, his counsel have the right to read and argue the law of his case to the jury.'' Subsequent thereto, nearly fifty years ago, the Court in *Smithson v. State,* 127 Tenn. 357, 155 S.W. 133, held that it was not reversible error and was within the sound discretion of the trial court to deny the reading of an opinion. The Court in that opinion cited a number of out of state cases for its conclusion, but did not refer to the two cases last above mentioned. Since that time the Court in 1930 in *Davis v. State,* 161 Tenn. 23, 28 S.W. 2d 993, has followed the conclusion of the Smithson case, and then this was recently followed in 1958 in *Marable v. State,* 203 Tenn. 440, 313 S.W.2d 451. In none of these cases though has there been any clear overruling of the Hannah case or any specific reasons why the rule should be any different than stated in the Hannah case. Each of these subsequent cases had the particular facts and rea-

sons before the Court of that case. Our conclusion is that since the harmless error statute of 1911, codified as Section 27-117, T.C.A., it is not error for the trial court as a blank proposition of law to refuse the party involved the right to read reported cases or textbooks. At the cost it is harmless error. Under the common sense logic in our system of jurisprudence and our faith and confidence in the trial judge in his judgment of how he runs his court and directs the trials, the rules on admission of evidence and other things done before a jury, that clearly it should be a discretionary matter with him. It is for this reason that we overrule the Hannah case as far as it states an abstract principle of law applicable on all occasions, and adopt the principle as stated in the later cases hereinabove cited to the effect that it is a discretionary matter. Such an error, if there is one in the refusal to do it, clearly in this case would be harmless error. Too, there is no constitutional provision that gives the person the right to read from lawbooks, even though in criminal cases the jury is the judge of both the law and the facts. Consequently the proposition that the harmless error statute does not apply because of the constitutional question as set forth in *Ford v. State,* supra, and the recent opinion of *Dykes v. State,* 201 Tenn. 65, 296 S.W.2d 861, would not be applicable. If there was any error herein it was harmless error. We think the correct practice is the discretionary rule.

This rule (harmless error) prevents our reversing any case that comes to this court where an error has been committed as a part of the procedure unless this Court is of the opinion after an examination of the entire record that such error affects the merits.

For the reasons hereinbefore stated we are satisfied that there is no error herein. The judgment below must be affirmed.

SWEPSTON, JUSTICE, not participating.

## On Petition to Rehear

BURNETT, JUSTICE.

We have just completed reading for the second time the courteous, scholarly and able petition to rehear. Between the readings of this petition we have done some further investigation of the matter. After having done so and thinking of the matter for some time, we are now in a position to determine, as we see it, the questions here presented.

The State in its answer to this petition says:

"* * * After reading the rather lengthy petition in behalf of the defendant, the State is unable to find any new authority, material points or new argument. The defendant in this petition has done no more than point out his disagreements with the conclusions reached by the Court. He strongly objects to the application of our Harmless Error Statute."

There is much meat in what the State says about this petition, but due to our respect for able counsel and the insistences made in the petition (realizing that it is almost impossible to file a petition to rehear without again rearguing questions that have been determined against the petitioner) we will consider such insistences as we deem necessary.

The petition now presented in essence is a scholarly and able argument aimed at interpretations the Court

has put on our Harmless Error Statute (Section 27-117, T.C.A.) over the last fifty years. This argument is to the effect that the Court should view the questions from an objective rather than from a subjective viewpoint. The practice over the years, as is shown by all the reported cases, is well stated in *Munson v. State,* 141 Tenn. 522, 213 S.W. 916, as:

"\* \* \* It was declared in all those cases, (the Court citing several cases just before making this statement) as well as others, that the merits of a criminal case is the guilt or innocence of the accused. Of course, there may be such violation or disregard of some constitutional right of the accused, not affecting the merits, that would induce the court to order a new trial; \* \* \*""

In our study of this case originally, and since this petition has been filed, we applied the Harmless Error Statute only to such cases as clearly, to our minds, the error claimed to have been committed did not affect the merits. The plaintiff in error clearly under this record had a fair trial. We will now take up one particularly of the claimed errors that we are alleged to have made in applying the Harmless Error Statute. We merely cite this one illustration because it was so forcefully and ably argued before us and in the original brief, and is again argued, and we think it illustrative of the position that is now taken in regard to our application of the Harmless Error Statute.

It is said that the court committed reversible error in the following portion of its charge, to wit:

"If a personal injury is unintentionally done to another by one who is engaged in an unlawful act, or if the act itself is essentially wrongful, it is not essen-

tial to show an unlawful intention for the intent is necessarily embraced in the wrongful act."

The petition to rehear says of this charge: "* * * we cannot conceive a charge to be more wrong and this is the only place in the entire charge of the Court where the subject was touched upon." Prior to quoting the above charge in the petition to rehear part of our quotation from *King v. State,* 157 Tenn. 635, 11 S.W.2d 904, 905, in our original opinion was quoted as the correct statement, that is, the quotation in the petition to rehear is:

"* * * If the act is a crime and *malum in se,* and the injury is a natural or probable consequence of the act, he is guilty of assault and battery * * *"

This statement, just quoted from *King v. State,* supra, is one sentence quoted out of a quotation which this Court adopted in the King case from Clark & Marshall on Crimes. The argument now made is that since the charge as above quoted is in the disjunctive rather than the conjunctive it is so erroneous as to constitute reversible error. The same argument was made at the bar and in the original brief, though in somewhat a different manner from that now made. A careful reading of *King v. State,* supra, shows that immediately following the quotation from Clark & Marshall, which is said to be correct, this Court quoted with approval from 2 R.C.L., page 529, in language almost identical (in fact, it seems to us a verbatim copy from the King case) with the exception of the conjunction "or". The Court in quoting from R. C.L. in the King case says this: "* * * if the act itself is essentially wrongful, it is not necessary to show an unlawful intention, for the intent is necessarily embraced in the wrongful act."

The argument, as said, is that by use of the word "or" it is made disjunctive and this consequently makes it so erroneous as to constitute reversible error. It will be noted in the charge quoted the court charged, "If a personal injury is unintentionally done to another by one who is engaged in an unlawful act, or if the act itself is essentially wrongful," then it is not necessary to show an intent because that is embraced in the wrongful act. The conjunction "or" is not always disjunctive in signification. There are familiar instances given in the law books in which the conjunction "or" is held to be equivalent in meaning to the copulative conjunction "and", and such meaning is often given to the word "or". The conjunction "or" is frequently used to connect two thoughts expressing the same idea. Certainly that was the meaning of the trial court in giving this instruction. Thus it is perfectly obvious to anyone that isn't so engrossed by reason of the advocacy that such an error, if it be, is plainly harmless error.

We are rather severely chastised for a statement we made on page 901 of our opinion as to the distance Mr. Alexander's car was from the house. It is argued again in the petition to rehear, as it was argued before us in the original brief, that "there is no credible evidence in the record that the distance was 'some forty to fifty feet.'" All we said was that Mr. Alexander made this statement and the record clearly shows that he did regardless of what his answers were on cross-examination. As we said in the original opinion all of these things were matters for the jury to consider. We think unquestionably that this is true.

Then we are criticized for making the statement in *arguendo* in the opinion that had Mr. Alexander turned

around when the shot was fired it could have put his eye out; that this constitutes no reason for the weapon being classified as a dangerous weapon because it is said that in *Highsaw v. Creech*, 17 Tenn.App. 573, 69 S.W.2d 249, the Court of Appeals held that an air rifle was not a deadly weapon when one was shot in the eye by a small boy with an air rifle and his eye put out. Of course, air rifles are classed as toys and are bought for small boys. As we see it, there can be no fair comparison at all to shooting one with a .20-gauge gun and a small boy in his play using an air rifle. We could cite illustration upon illustration of things of the kind but we feel it isn't necessary to do so.

Finally, we are criticized rather severely for overruling the interpretation that is normally put on *Hannah v. State*, 79 Tenn. 201. The ordinary acceptation of this opinion, and it is classed along with these opinions, is that the defense may read any law that it wants to in a criminal case and the failure to the court to allow this to be done is reversible error. The Hannah case did not hold that, even though it has been so classed over the years and viewed from that viewpoint. In the Hannah case the court allowed counsel to argue the law but refused to permit the reading of any law, and it was under the facts of the Hannah case the court reached the right conclusion. We though in this case do not have that question at all. We cited in the original opinion cases that have held over the last fifty years that it was a discretionary matter with the court as to what, or how much, law should be permitted to be read in the defense of a case, and it was on this theory, and this alone, that the accepted rule in the Hannah case was overruled, and we adopted definitely the rule in this State that the

reading of law to the jury in a criminal case was a discretionary matter with the trial court. Of necessity this rule must be the correct rule to adopt and each case will be bottomed on whether or not the trial court abused his discretion in allowing or disallowing the reading of law to the jury. In this case we felt that there was no abuse of discretion under the facts herein. We in the original opinion distinguished this from the Dykes case now again relied upon.

■■■ We consider the punishment justified under the factual situation herein. Ordinarily this Court will not disturb the punishment imposed by the jury if within the limits allowed by law. *Edwards v. State,* 202 Tenn. 393, 304 S.W.2d 500; *Ryall v. State,* 204 Tenn. 422, 321 S.W.2d 809. There is nothing herein to indicate passion, prejudice and caprice.

After a very careful study of the petition to rehear and the various propositions therein stated, some of which we have pointed out heretofore, we must overrule the petition and affirm the judgment below.

SWEPSTON, JUSTICE, not participating.