Charles Hunter, Franklin Wright, Ulous Harris, Earl Foster, Garfield Huston, Edgar Williams, Jr. and Elester Benton, Plaintiffs in Error,

*v.*

State of Tennessee, Defendant in Error.

440 S.W.2d 1.

(*Jackson*, April Term, 1968.)

Opinion filed February 14, 1969.

Petitions to Rehear Denied April 18, 1969.

Second Petition to Rehear Overruled August 22, 1969.

674

ALBERT H. BOYD, Memphis, for Charles Hunter and Franklin Wright.

RUSSELL X. THOMPSON, Memphis, for Ulous Harris, Earl Foster, Garfield Huston, Edgar Williams, Jr. and Elester Benton.

GEORGE F. McCANLESS, Attorney General, and ROBERT F. HEDGEPATH, Assistant Attorney General, Nashville, and PHIL M. CANALE, JR., District Attorney General, Memphis, prosecuted the case in the trial court.

Mr. Justice Creson delivered the opinion of the Court.

This is an appeal by seven of the original eleven defendants from judgments of conviction for the offense of rape.

On September 21, 1965, Charles Hunter, Franklin Wright, E. L. Harris also known as Ulous Harris, Elester Benton, Booker T. Fossett, Edgar Williams, Jr., Johnnie Lee Green, Andrew Lee Pearson, and Earl Foster were indicted for rape—the unlawful carnal knowledge of a woman, forcibly and against her will. T.C.A. sec. 39-3701. On December 3, 1965, the indictment was amended by the Grand Jury for the purpose of adding the name of Garfield Huston. On December 14, 1965, the indictment was again amended and Amos Lee Marshall was made an additional defendant.

The trial commenced on January 18, 1966, and ran continuously for one month. During the process of the trial, on February 11, 1966, a nolle prosequi was entered as to the defendant Booker T. Fossett. On February 17, 1966, the jury, by its verdict, found Charles Hunter, Franklin Wright, Ulous Harris, Earl Foster and Garfield Huston guilty of rape, and fixed punishment at death by electrocution. Elester Benton, Edgar Williams, Jr. and Andrew Lee Pearson were also found guilty of rape, and their punishment was fixed at ninety-nine years in the State

Penitentiary. The jury acquitted Johnnie Lee Green and Amos Lee Marshall.

Following the trial, lengthy written motions for new trial were filed by all convicted defendants. A hearing was held to consider the motions. The Court granted a new trial to Andrew Lee Pearson and overruled all other motions.

The seven convicted defendants have perfected an appeal to this Court. These plaintiffs in error will be referred to herein as Hunter, Wright, Harris, Foster, Huston, Williams and Benton. The defendant in error will be referred to herein as the State.

The evidence was that the rape occurred on November 14, 1964, in North Memphis, Tennessee. The two victims —white females, sixteen and fourteen years of age, respectively—had attended a drive-in movie with their dates, also white teenagers. The four youths left the drive-in theatre at approximately 10:00 P.M., and drove around a portion of Shelby County. They then drove to a secluded area in the vicinity of a large manufacturing plant. The driver parked the car in a narrow lane with the front of the vehicle headed in the direction of the main road. Approximately ten minutes later, a car approached and stopped directly in front of the white youths' car, blocking their exit. Eight to ten young Negroes jumped out of their car. The white youths tried to get away by backing their car down the narrow road, but succeeded only in driving off into a deep ditch. The Negro youths ran after the car, broke out some of the windows, and forced the white youths out of the car. Some of the Negro youths proceeded to forcibly sexually assault the two girls, while the remainder of the Negro youths held the victims' dates on the ground. Each girl

was assaulted numerous times, with the whole episode lasting approximately one to two hours. We need not go further into detail; suffice it to say that this case represents one of the most heinous mass rapings the Court has had the displeasure to consider.

There are numerous assignments of error, which concern several aspects of the Tennessee criminal law and procedure. In summary, an examination is made into the law regarding (1) severance of co-defendants for trial (2) use of confessions in a joint trial (3) use of rebuttal testimony (4) right to a preliminary hearing (5) right to a court reporter under T.C.A. sec. 40-2029 et seq. (6) admissibility of confessions (7) use of admissions by conduct (8) requirements of disclosure of statements and evidence by the attorney general (9) effect of improper remarks and conduct by the attorney general (10) constitutionality of the rape statute and the punishment imposed by it, and (11) powers of the trial court in controlling the conduct of the trial.

All defendants, with the exception of Wright, assign as error the action of the trial judge in overruling their motions for severance. This Court has previously held that the granting of a severance is within the discretion of the trial judge. The test to determine if the trial judge was in error in failing to grant a motion for severance is whether or not the defendant was clearly prejudiced in his defense by being jointly tried with his co-defendants. *Ellis v. State* (1966) 218 Tenn. 297, 403 S.W.2d 293; *Tomlin v. State* (1960) 207 Tenn. 281, 339 S.W.2d 10; *Stallard v. State* (1948) 187 Tenn. 418, 215 S.W.2d 807. As aptly pointed out in *Ellis v. State,* supra, the difficult inquiry which must be made on appeal to answer this assignment is whether or not the defendant

was clearly prejudiced to the point that the trial court's discretion ended and the granting of severance became a judicial duty.

In the present case motions for severance were made by nine of the eleven defendants. The principal grounds asserted by these motions were (1) that the defendant could not receive fair and impartial consideration by the jury if tried with the other defendants, and (2) that it was prejudicial to the rights of those who did not confess to be tried with those who did confess. A full hearing was held on the motions for severance. The record of that hearing has been preserved in a wayside bill of exceptions. It was concluded by the trial judge, and it is obvious to this Court upon examination of the proceedings, that the only way to indulge all the requests for severance would be to grant a separate trial for each defendant. Other motions sought to split the defendants into various groups for purposes of trial. Taken together, the motions urged that the defendants be tried either alone, or together in groups consisting of: (1) Those that were named in any of the confessions; (2) those that were not named in any of the confessions; (3) those that confessed; (4) those that were named in the confessions and stood mute; (5) those that were not present when certain of the confessions were made; or (6) those that were present when certain of the confessions were made.

Had the defendants' insistences been the sole consideration of the trial court, it is obvious that it would have granted separate trials to each. However, the trial court was involved in a process of balancing the interests and rights of the individual defendants against those of the State. This guideline was enunciated by this Court in

the case of *Woodruff v. State* (1932) 164 Tenn. 530, 51 S.W.2d 843:

"It may have been to the interest of each that he be tried alone, but the orders of the court are molded to protect rights, and not merely the interests, of persons accused of crime. The state, as well as the persons accused, is entitled to have its rights protected, and when several persons are charged jointly with a single crime, we think the state is entitled to have the fact of guilt determined and punishment assessed in a single trial, unless to do so would unfairly prejudice the rights of the defendants."

We have examined the allegations of prejudice resulting from the joint trial and find that they do not evidence an abuse of discretion on the part of the trial judge in refusing to grant the requested severances.

■■ Specifically, it is first asserted that the defendants were denied a competent jury in the joint trial because the trial judge failed to excuse jurors for cause on the ground of inability to render a fair and just verdict. When asked on voir dire whether or not it was possible to keep facts and faces separate, all but one of the prospective jurors answered that he would have difficulty in this regard. Under the circumstances, some reservation in answer to such a question was not improper. The trial judge personally sought a determination of whether or not each juror could and would perform to the best of his ability. His ruling in this regard is given great weight. *Thomas v. State.* (1902) 109 Tenn. 684, 75 S.W. 1025. We must conclude from a review of the record that the defendants had the benefit of a fair and impartial jury, and that there was no abuse of discretion by the

trial judge in refusing to disqualify a juror merely because he might have trouble comprehending the vast amount of testimony. The record clearly shows that the trial judge made continual efforts during the trial to insure that the jury properly digested and separated the facts.

Secondly, it is urged that the defendants were prejudiced by the joint trial, in that they were subjected to the contents of confessions implicating some of the defendants and exonerating others. The defendants rely heavily upon *Stallard v. State,* supra, where this Court said:

"(2) In 23 C.J.S. Criminal Law sec. 935, it is said: 'If one of several defendants jointly indicted has made admissions or confessions involving another defendant, the court may, in its discretion, order a separate trial, so that the admissions or confessions, while evidence against the one, may not prejudice the other, and where the circumstances are such that an instruction to disregard the confession of one when considering the guilt of another would prove ineffective to eradicate the impression on the jury the severance should be granted, unless the prosecuting attorney expressly declares that such statements will not be offered in evidence on the trial, or unless all reference to the moving defendant is eliminated from the confession.' "

■ The present situation is not analogous to the ultimate holding in the just mentioned case. There, it was held that the severance should have been granted, since the confession of a co-defendant directly charged the defendant with the crime and the co-defendant did not take the stand to permit cross-examination. In the situa-

tion now before us, several of the defendants made confessions implicating other co-defendants, but each of these confessors took the stand and was subjected to cross-examination by his co-defendants.

In this same connection it is argued that the names of co-defendants should have been deleted from the confessions, even if admitted. However, this measure presented the additional problem of prejudicing those defendants who were not named in the confessions. The trial judge gave the respective defendants' attorneys an opportunity to resolve this question among themselves. When this proved unsuccessful, he wisely and correctly said:

> "—so I think that I'm going to have to take the bull by the horns and decide it myself and I think the only thing that we can do is to have no deletions at all and to make a proper instruction to the jury at this time and later in written instructions that they can consider the statements against the person making—under a proper charge, those there who didn't object to it, with a precautionary charge about that and that they, as to those people that were not there and were charged with performing some criminal acts that they can't consider it for any purpose whatsoever. Now I think that's the lesser of the evils and that's what will be done and that's my judgment on the matter and you gentlemen who wish to, may vote your exceptions."

Several times during the trial, the court made determined efforts to protect defendants who were named in confessions but were not present when the confessions were given. In reviewing the record, this Court has found numerous instances where the trial judge gave special

instructions to the jury. On the issue of proper use of a confession, he stated:

"THE COURT:

All right, let me make this clear to the jury. Gentlemen of the jury, at this time, Booker T. Fossett was not present and this statement can not be considered against him in any way. Charles Hunter was not present the statement can not be considered against him in any fashion, there were some other defendants that were not present, the same will hold for them, Earl Foster, Garfield Huston, Amos Lee Marshall. I think at this time, gentlemen I should tell you this. I understand that in a case of this kind all the proof that the arguments of counsel, you'll be given a complete charge that you will take along with the indictment to your room back there. All the law that will be given you by the Court will be in writing that you will have at all times, now I'm going to charge you this, at the end of the case, I think I should charge it to you now too. Accusations made in the presence of a defendant: If accusations or statements tending to show defendant's guilt have been proven in this case, and shown to have been in the presence of such defendant, heard and understood by him and undenied by said defendant, and the situation of the parties demanded a denial, this fact should be considered by the jury in the light of all other facts and circumstances in the case, but such evidence is of dangerous character and must be received with great caution. Now I will give you this charge at the end of the case, but I think I should give it also to you at this time."

The trial judge gave similar instructions at other pertinent points during the trial, in an effort to insure the defendants a fair and just trial.

■ It is next asserted that by a joint trial, the State was able to utilize the rebuttal testimony of the witness Mrs. Vester Johnson to attack the credibility of Hunter and Wright and to also affect the case against all defendants. As will be discussed in this opinion, the testimony of Mrs. Johnson went solely to impeachment of the testimony of defendants Hunter and Wright. Neither was it prejudicial for the trial judge to charge on the subject of conspiracy. There was sufficient circumstantial evidence introduced to support this charge.

In the present case, the defendants were given full latitude in making their defenses. Each was allowed to cross-examine the other defendants. The trial court took every precaution to insure fair treatment of each defendant by giving instructions to the jury, where necessary, for proper distinction of parties and events. As previously pointed out, the only alternative would have been to grant a separate trial for each of the eleven defendants, and this was a practical impossibility. It would have unduly burdened the State prosecutors, all the witnesses, judges, juries and administrative staffs; and it would have prolonged the prosecution to such an extent that at least part of the defendants could well have been denied their right to a speedy trial. It is our conclusion that the defendants were given a proper trial by a fair and impartial jury; and they were not unduly prejudiced by being jointly tried.

Defendants contend they were denied a fair and speedy trial, as required by the Constitutions of Tennessee and

the United States. Several of the defendants were arrested on May 28 and 29, 1965, and held without bond until the trial on January 18, 1966. It is quite apparent that this case could not go to trial earlier because of (1) the need for necessary police investigation; (2) the process of appointing counsel to represent the defendants; and (3) the necessity for affording these counsel adequate time to prepare for trial. As eleven individuals were implicated as defendants, it took several months to locate and apprehend all of them.

■■ The trial judge did grant a continuance on December 6, 1965, on the applications of defendant Huston and the State. As a general rule, the granting of continuance rests within the sound discretion of the trial judge. *Moorehead v. State* (1966) 219 Tenn. 271, 409 S.W.2d 357. The trial judge had two reasons for granting the continuance: (1) He wanted to allow a later joined defendant time to prepare for the trial, and (2) he wanted to prevent having a jury locked up during the Christmas and New Year holidays. He did not abuse his discretion in granting the continuance. Under the circumstances, this Court feels that it is somewhat remarkable that the case was brought to trial as promptly as it was.

The defendants complain that they were denied due process of law by not being given a preliminary hearing. It is asserted that upon arrest, the defendants were merely taken before the magistrate for a finding of probable cause and to obtain warrants, but not for the purpose of having a preliminary hearing.

The record shows that the majority of the defendants were arrested between May 28, 1965 and June 1, 1965.

The defendants were held in the County Jail between the time of arrest and the indictment by the Grand Jury on September 21, 1965. That same day, and the following day, counsel were appointed to represent defendants Foster, Harris, Williams and Benton. On September 22, 1965, defendants were arraigned, with the exception of defendant Huston (who was made a defendant on December 3, 1965), and all entered not guilty pleas.

■ Under the Tennessee criminal procedure, in a county where the Grand Jury is in continuous session, defendants are bound over without a preliminary hearing. T.C.A. secs. 40-401—40-406. The preliminary hearing is not a critical stage of the proceedings in Tennessee and a defendant has no constitutional right to a preliminary hearing. *State ex rel. Reed v. Heer* (1966) 218 Tenn. 338, 403 S.W.2d 310; *State ex rel. Wood v. Johnson* (1965) 216 Tenn. 531, 393 S.W.2d 135; *Dillard v. Bomar,* 6th Cir. (1965) 342 F.2d 789. Our review of the record indicates that these defendants were not in anywise prejudiced by any of the proceedings which took place prior to trial.

■ Error is assigned, however, on the trial court's action in denying the defendants to present an attorney to testify as to matters which took place before the magistrate. The trial court properly refused to allow this testimony on the ground that it was irrelevant. This ruling is not in conflict with the ruling of the trial judge that it was not error for the prosecution to refer to a writ of habeas corpus filed by the defendants prior to the trial. This writ of habeas corpus was a court record and a part of the proceedings in the case.

■ It is true that a three and one-half month delay occurred between the arrest and the return of the

indictment by the Grand Jury, with the subsequent appointment of counsel. Considering the nature of the investigatory efforts required to be expended by the State, this span of time was not at all unreasonable.

 Defendants contend that the trial court erred in refusing to grant permission to their attorneys to bring a camera into the jail for the purpose of taking pictures for use in the investigation. It is not clear from the record why this petition was denied; but neither is there any authority or persuasive argument advanced by the defendants to suggest it should have been granted.

It is said that the trial court erred in failing to grant the defendants' petition for the appointment of a court reporter at State expense. They argue that T.C.A. secs. 40-2029—40-2043 provide for a court reporter to attend the trial and prepare a transcript at State expense for indigent defendants. The trial judge refused to grant the request on the ground that the system used by the Shelby County Criminal Courts was a proper method within the terms of the statutes providing indigent defendants with a transcript of the record. These courts utilize recording equipment during trials. The records are later typed by a clerk who was not present during the trial.

T.C.A. sec. 40-2042 authorizes the use of recording equipment when a court reporter is not available to record the proceedings. In the instant case the trial judge disclosed that sufficient funds had not been appropriated to provide each of the Shelby County Criminal Courts with a court reporter. The statute in question explicitly makes provision for the method used here when circumstances are such as now appear.

█ It was pointed out by the trial judge that recording equipment was authorized for the larger metropolitan areas in Tennessee, since accurate verbatim transcripts could be more economically, expeditiously and efficiently provided in these areas, using this system. The Legislature apparently had this procedure in mind when they enacted T.C.A. sec. 40-2043, which provides as follows:

"40-2043. *Contracts authorized providing verbatim transcripts without utilizing court reports.* — Whenever the executive secretary and the judge or judges in a particular area determine that accurate verbatim transcripts could be more economically, expeditiously and efficiently provided in such area by entering into contracts for that purpose rather than by utilizing the designation of court reporters as herein provided, then, in such instances, the executive secretary is authorized to enter into such contracts for and on behalf of the state of Tennessee on such terms and conditions as he deems appropriate for the accomplishment of the purposes of secs. 40-2029—40-2043. (Acts 1965, ch. 221, sec. 15).

The record in this case consists of over 3,000 pages, combined into 21 volumes. It is true that there are some words or phrases which were not properly recorded and transcribed, but no incidents have been shown to this Court whereby the defendants were prejudiced by the use of the machine recorder. We would feel it hypercritical, indeed, to say that these defendants have not been afforded a reasonable and sufficient record.

All defendants assign as error that there is no evidence to sustain the verdict of the jury; that the evidence preponderates against the verdict and in favor of the in-

nocence of defendants; and that the verdict is contrary to the law and the evidence.

 In considering these assignments of error, this Court must look to the well established law of this State regarding review of criminal cases; that is, that a jury's verdict of guilty, approved by the trial judge, establishes the credibility of the witnesses supporting the verdict, displaces the presumption of innocence that attached to the defendant in the trial court, and raises a presumption of guilt; putting on defendant the burden of showing, on appeal, the evidence preponderates against the verdict and in favor of the innocence of the accused. *Cooper v. State* (1909) 123 Tenn. 37, 138 S.W. 826; *Holt v. State* (1962) 210 Tenn. 188, 357 S.W.2d 57; *McBee v. State* (1963) 213 Tenn. 15, 372 S.W.2d 173.

A proper analysis of this assignment of error requires an examination of the record to ascertain the evidence presented for and against each of these defendants.

Defendant Hunter was personally identified by one of the female victims. This defendant had been seen in the possession of a bayonet similar to the one used during the crime and left at the scene. He denied having anything to do with the rape or having been in the area; but his testimony in this regard was impeached.

Defendant Wright was personally identified by one of the female victims. Two witnesses testified that they had seen him with a bayonet similar to the one used during the crime and left at the scene. He confessed the crime on three different occasions and his confessions were properly admitted in evidence against him.

Defendant Huston was personally identified by one of the female victims. Her testimony in this regard was that

she was sure this defendant was one of the perpetrators because she had endured nightmares about him since the offense. He offered an alibi but it was not wholly substantiated. In addition, his testimony was affected by obvious false statements.

Defendant Foster was identified by one of the female victims. Her testimony in this regard was strengthened in that she remembered this particular defendant having sexually assaulted her more than once. She stated that he also hit her several times and talked with her at length. He offered an alibi but it was not firmly established.

Defendant Benton was implicated as a participant in the crime by the confession of defendant Green. In corroboration of this confession, testimony was given by police officers that defendant Benton admitted his presence at the scene of the crime. In addition, there was an admission by conduct in that defendant Benton was present during the confession of defendant Green, but remained mute.

Defendant Williams was implicated by the confessions of defendants Wright and Green. Both of the confessions were given in Williams' presence, and he did not deny the accusations. This constituted an admission by conduct which raised the inference of the truth of the statement. In further corroboration of the confessions was the fact that this defendant was also known as "Sonny Hooker." During the crime, one of the participants was referred to, repeatedly, as "S. H." The arresting officers testified that this defendant exerted every effort to keep other arrested defendants from saying anything—admonishing at least two of them to "keep your damn mouth shut."

Defendant Harris was implicated by the confessions of defendants Wright and Green. These confessions were given in his presence. He did not deny the accusations but stood mute. This constituted an admission by conduct which raised the inference of the truth of the accusation. Of similar import was his conduct upon arrest. The arresting officers testified that he remained relatively relaxed when taken into custody, until he was confronted with several co-defendants. At that point, his body stiffened and he exclaimed, "Oh, my God." He offered no alibi, but rather testified that he could not recall his whereabouts on the day of the crime.

 After a thorough examination of the record in this case, this Court is convinced that the evidence does not preponderate against the verdict of the jury.

 In discussing the meaning of preponderance of the evidence it was said by the trial judge that, in the case of Williams, Harris and Benton, the jury could infer from their silence, in the face of an accusation, the truth of that accusation. This silent acquiscence is more properly termed an admission by conduct. It may be generally stated that if a statement is made containing an accusation or assertion of fact, which the accused party would, under all circumstances, be expected to deny if untrue, the failure to speak is circumstantial evidence and raises an inference of the truth of the statement. See generally, McCormick on Evidence (1954) sec. 347; 31A C.J.S. Evidence secs. 294-296. The courts in this State have recognized three situations in which this evidence is inadmissible: (1) Where the statement is made by a witness in court, *Jones v. State* (1946) 184 Tenn. 128, 196 S.W.2d 491, (2) where the defendant is in custody and the statement is made before he is informed of his constitutional

right to remain silent and have the assistance of counsel, *Lanier v. State* (1966) 219 Tenn. 417, 410 S.W.2d 411, and (3) where the defendant does not specifically deny the accusation, but responds by expressly refusing to make any statement. *O'Brien v. State* (1967) 221 Tenn. 346, 426 S.W.2d 507. None of these exceptions are applicable in the present case.

■■■ A somewhat different explanation was placed on the rule by the United States Supreme Court decision in *Miranda v. Arizona* (1966) 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694. In Footnote 37 of the majority opinion, it is stated:

> "In accord with our decision today, it is impermissible to penalize an individual for exercising his Fifth Amendment privilege when he is under police custodial interrogation. The prosecution may not, therefore, use at trial the fact that he stood mute or claimed his privilege in the face of accusation."

Even leaving aside all other reasons, as with the other interrogation standards set forth in *Miranda,* this guideline applies prospectively only. The case now before this Court was tried before *Miranda;* consequently, pre-*Miranda* standards are to be applied.

An astute analysis of the basic rule and the reasons for it was made in *Phelan v. State* (1904) 114 Tenn. 483, 88 S.W. 1040. Approval of the rule was given in *Camper v. State* (1948) 187 Tenn. 511, 216 S.W.2d 18; *Oliver v. State* (1961) 208 Tenn. 692, 348 S.W.2d 325. *Boulton v. State* (1964) 214 Tenn. 94, 377 S.W.2d 936; and *Turner v. State* (1965) 216 Tenn. 714, 394 S.W.2d 635.

The trial judge ruled this evidence admissible but gave the following precautionary instruction to the jury:

"THE COURT:

All right, gentlemen this precautionary charge which will be given to you at the end of the case. Accusations or statements tending to show a defendant's guilt have been proven in this case and shown to have been made in the presence of that defendant, heard and understood by him, and undenied by said defendant, and you find that the situation of the parties demanded a denial, this fact should be considered by the jury in the light of all the other facts and circumstances in the case. But such evidence is of a dangerous character and must be received with great precaution. All right, sir, you can proceed."

■■■ Under the applicable rules applied to the factual situation in the present case, we conclude that the trial judge properly admitted these admissions by conduct.

■■■ Defendant Wright assigns as error that the trial court erred in ruling that he was mentally competent to stand trial. He argues that the mental examination ordered by the court was superficial and inconclusive. The record indicates that following Wright's petition for mental examination, the trial judge ordered that he be examined by two licensed physicians. Both of these doctors testified that Wright was not mentally ill or in need of care and treatment in a mental hospital. The trial court followed proper procedure in this regard and committed no error in ordering the defendant to trial, based on the results of these examinations.

■■■ Defendant Wright asserts that it was error for the trial court to allow into evidence three confessions reportedly made by him to Captain Rodney Vandiveer, of the Shelby County Sheriff's Office. He says that the

confessions were not freely and voluntarily given; but, rather, were given as a consequence of physical intimidation and psychological pressure. The trial court held a hearing outside the jury's presence to consider the admissibility of these confessions. The admissibility of confessions of defendants Green and Pearson was also considered at the same hearing. The court heard testimony and arguments from all parties concerned, and ruled as a preliminary question of fact that the confessions were freely and voluntarily made without offer of reward, violence or threat, or promise or offer of immunity. The preponderance of the evidence contained in the record supports this ruling.

It should be again noted that this case was tried before *Miranda v. Arizona* (1966) 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694, and thus the proper test to be used in determining admissibility was the so-called voluntariness test. *Johnson v. New Jersey* (1966) 384 U.S. 719, 86 S.Ct. 1772, 16 L.Ed.2d 882. For this reason the investigating officers were not mandatorily charged with the duty of advising the defendants of their right to court appointed counsel if they could not afford private counsel. The court's charge to the jury regarding the admissibility of these confessions and the weight to be given them was, in all respects, proper.

It is further assigned as error that the confessions were inadmissible because they were given pursuant to an unlawful arrest followed by coerced interrogation. During the course of the trial, a wide divergence developed regarding the procedures which were taken by the police in arresting and interrogating these defendants. Numerous charges of brutality, coercion and intimidation were made by the defendants against the police officers.

698

■ On the other hand, testimony was given by the police officers that the arrests were made pursuant to T.C.A. sec. 40-803, which grants authority to arrest when a felony has in fact been committed, and the officer has reasonable cause for believing the person arrested to have committed it. Testimony was also given by police officers and by a court reporter that the interrogation was conducted in a proper manner—that all defendants were advised of their constitutional rights to remain silent, to have the presence of an attorney, and that anything they said might be used against them in a subsequent trial. The trial judge chose to believe the testimony of the State in this regard, and ruled that the arrests were legal and that the interrogation was proper. The defendants have not advanced sufficient evidence for this Court to conclude that the preponderance is to the contrary.

■ Assignment of error has been made regarding the refusal of the trial court to allow defendants' counsel to examine the statements of the two female victims which were given to the police the night of the crime. It was admitted that these statements were re-read by the victims prior to their testimony. Error is also alleged in not permitting defendants' counsel to examine the personal investigation notes of Captain Vandiveer. Captain Vandiveer admittedly used the notes to refresh his memory prior to testifying; although he was prohibited by the trial judge from using them while on the stand. The defendants' attempt to classify these statements as memoranda used to refresh recollection. However, the principles governing memoranda of freshened recollection discussed by this Court in *Leach v. State* (1967) 220 Tenn. 526, 420 S.W.2d 641, do not apply where the par-

ticular memorandum is not presented to, or used by, the witness while he is testifying, such as the case here.

We can see no reason which would compel the trial judge to order the Attorney General to provide the defendants with the prior statements and notes of these witnesses. This Court has held that the Tennessee statute requiring the release of oral or written confessions to the defendant does not apply to the statements of a prosecuting witness. *Bolin v. State* (1966) 219 Tenn. 4, 405 S.W.2d 768. This State has never followed what may be termed an open file policy by which a defendant could examine all notes, statements, or other evidence gathered by the prosecution. The Tennessee Legislature has gone no further than the 1963 enactment which provides that written or oral confessions or admissions against interest made before any law enforcement officer or agency shall be given to the defendant or his counsel, on demand; and that no confession or admission against interest shall be admissible in evidence without compliance. T.C.A. sec. 40-2441. The Legislature has not required the disclosure of prior statements of prosecuting witnesses for the purpose of cross-examination or impeachment when the statements were not used while testifying. No constitutional right to due process is involved. A recent annotation of this problem reveals that the majority of states are in accord with this view. See Anno. 7 A.L.R. 3d 181, at pp. 198-205, 247-251.

The defendants allege that T.C.A. sec. 40-2441 was violated by the failure of the Attorney General to release all of defendant Wright's confessions, upon demand. Wright's attorney requested the release of all statements, and, pursuant to that request, the Attorney General released three confessions made by defendant Wright.

At the argument of motion for new trial, it was found that a fourth statement made some months prior to the ones which were released, was held by the Attorney General. No attempt had been made to introduce this undisclosed statement into evidence. It was an exculpatory statement by which defendant Wright denied any participation in the rape.

 T.C.A. sec. 40-2441 pertains only to "written or oral confession or admission against interest" and not to exculpatory statements. Since Wright's statement falls into this latter category, there was no requirement for the State to forward it to Wright's counsel upon demand. Certainly, no violation of the other defendants' rights occurred by not having access to this statement. This Court has held that a defendant is not prejudiced because not furnished with a copy of a co-defendant's statement where this co-defendant testified as a witness and was subject to cross-examination. *Morrison v. State* (1965) 217 Tenn. 374, 397 S.W.2d 826, 400 S.W.2d 237.

 It is further urged that this statement by defendant Wright, although not used at the trial, constituted proper newly discovered evidence to require the granting of a new trial. This Court must conclude that the statement in no way affected the outcome of the trial. It was exculpatory in nature and the substance of the statement was repeated in the course of Wright's testimony at the trial. The test required for reversal because of newly discovered evidence was not met. *Clarke v. State* (1966) 218 Tenn. 259, 402 S.W.2d 863. Neither was it error for the trial judge to refuse to grant a continuance of the hearing on motion for new trial to allow the defendants to investigate the alleged newly discovered evidence.

Defendants Hunter and Wright strongly object to the court's ruling by which Mrs. Vester Johnson was allowed to testify as a rebuttal witness for the State. The State had attempted to utilize Mrs. Johnson as part of their case in chief but was prevented from doing so by the trial court's ruling. Apparently, the State hoped to show by Mrs. Johnson's testimony that defendant Hunter and Wright had guilty knowledge as to the location of the crime; and further, that a conspiracy was in progress to which all of the defendants were parties. She was permitted to testify in rebuttal to attack the credibility of Hunter and Wright. Both of these defendants, upon cross-examination by the State, denied being in the area of the rape previous to the night in question. The gist of Mrs. Johnson's testimony was that she had seen Hunter and Wright in the vicinity of the crime on a night two weeks prior to the rape. She apparently had other information but the court prevented her from going further.

Prior to Mrs. Johnson's taking the stand, the trial judge gave careful instructions to all attorneys that they should exercise extreme caution in examining this witness, so as not to elicit prejudicial, irrelevant testimony from her. Accordingly, she made only the above-mentioned statement in response to the State's query. None of the defendants' counsel cross-examined her.

This Court concludes that the trial judge properly confined the testimony of this witness to rebuttal and committed no error in cautioning counsel to carefully phrase their questions. As a result, her testimony went only to the impeachment of the testimony of defendants Hunter and Wright, and was properly admitted.

Further objection is made to the Attorney General's purported use of Mrs. Johnson's testimony in his final

argument to the jury, by which he intimated that a conspiracy had been initiated on the night Mrs. Johnson testified that Hunter and Wright were in the vicinity of the crime. It is argued that this statement raised the rebuttal testimony of Mrs. Johnson from its proper place of testing the credibility of Hunter and Wright to the improper place of having probative effect on the guilt of the defendants. They cite as authority *Harrington v. State* (1965) 215 Tenn. 338, 385 S.W.2d 758.

In *Harrington v. State,* supra, timely objection was made to the Attorney General's remarks to the jury. Here, no objection was made to the remark of the Attorney General now being questioned. This Court has ruled numerous times that it will not consider an improper argument or remark of counsel unless objection is made or exception taken at the time of the argument. See *White v. State* (1962) 210 Tenn. 78, 356 S.W.2d 411, and cases cited therein. Notwithstanding the procedural difficulties, this Court is not convinced that the alleged improper conduct would have affected the verdict to the prejudice of the defendants, as is required for reversal. *Harrington v. State,* supra.

The defendants complain of the trial judge's refusal to allow them to change seats during the trial. This request was made in order to test the ability of the victims to identify certain of the defendants during the course of the trial. These matters are clearly within the discretion of the trial judge in properly conducting the trial. We find no abuse of that discretion.

It is alleged that the trial court erred in not declaring a mistrial because of numerous improper questions and remarks which were calculated to prejudice

the defendants. It is further asserted that the Attorney General, in his final argument to the jury, misquoted evidence, argued outside the facts, and made inflammatory remarks. Most of the incidents cited by the defendants concern statements or questions by the Attorney General which, when objected to, were ruled improper, and instructions were given to the jury to disregard. The trial judge is given wide discretion in controlling the conduct of counsel, both during the taking of testimony and on argument. To sustain an assignment of error regarding this subject, it is necessary that an abuse of discretion be shown. To justify a reversal on this ground, it must affirmatively appear that the improper conduct affected the verdict to the prejudice of the defendant. *White v. State,* supra; and *Harrington v. State,* supra.

This particular case was hard fought on both sides. Tempers flared, occasionally, and remarks were made which would better have remained unsaid. Nevertheless, the trial judge maintained control. We have studied the record as to each incident pointed out by defendants, and we must conclude that the trial judge did not abuse his discretion in refusing to grant a mistrial based on any remark or misconduct by the Attorney General.

 It is argued that the judgments rendered against these seven defendants were so excessive as to indicate passion, prejudice and unaccountable caprice on the part of the jury. The defendants contend that nowhere in reported cases has punishment been so harsh for a crime of this nature. The same argument was presented to this Court in *Carroll v. State* (1963) 212 Tenn. 464, 370 S.W.2d 523, and was rejected wherein the Court held:

"(12) Rape is one of the highest crimes against civilized society; and the statute (T.C.A. sec. 39-3702) de-

clares that whoever is convicted of rape 'shall suffer death by electrocution,' but provides the jury may, if they think proper, commute the punishment to imprisonment for life, or for any period not less than ten (10) years. The matter 'rests in the sound discretion of the jury upon the evidence and under the law as given them in the charge by the court' (*Temple v. State,* 127 Tenn. 429, 435, 155 S.W. 388, 390).

(13,14) According to the proof, the rape in this case was accompanied by the most aggravated circumstances—burglary, violence, assault, and threats of death. The punishment imposed, though severe, was authorized by law. Where the punishment imposed by the jury was within the limits allowed by the law, it cannot be said that their verdict indicated passion, prejudice or caprice upon their part. *Edwards v. State,* 202 Tenn. 393, 401, 304 S.W.2d 500; *Ryall v. State,* 204 Tenn. 422, 425, 321 S.W.2d 809.''

■■■ All defendants were convicted of rape, the maximum penalty for which is death by electrocution. The record indicates no specific evidences of passion, prejudice or caprice. Accordingly, this assignment is overruled.

It is next asserted that the statute under which all defendants were convicted is unconstitutional. The reasons assigned for this unconstitutionality are (1) that the statute provides no process whereby each individual in a joint trial may be considered separately for purposes of conviction and sentence; (2) that the death penalty is a cruel and unusual punishment, in violation of the Seventh Amendment to the Federal Constitution; (3) that the rape statute fails to define the proper case

in which the jury should commute the punishment to a sentence less than death; but rather permits the jury to inflict the death penalty in a discriminatory manner.

■ The punishment for rape is fixed by T.C.A. sec. 39-3702 as death by electrocution. The jury may commute the punishment to imprisonment for a period of not less than ten years. It is felt that the Legislature has wisely given the jury a wide discretion in administering punishment. Thus, they are able to consider each individual case on its particular facts and circumstances.

The defendants challenge the method by which punishment is administered in Tennessee. They complain that no investigation is made into an individual's background, or consideration given to his potentialities before imposing the sentence. The defendants make argument for the abolition of capital punishment. Nevertheless, these matters address themselves to the legislative branch and not the judicial branch of the government of this State. *State ex rel. Dawson v. Bomar* (1962) 209 Tenn. 567, 354 S.W.2d 763. In their present status, the statutes are constitutional and were properly applied to these defendants.

In a general assignment of error, the defendants urge that their constitutional rights were violated by the way in which the trial was conducted. They complain of inflammatory and incompetent testimony—that the trial was one of confusion from beginning to end. They assert that it was not possible to obtain a fair trial by this jury at this time.

It goes without saying that a criminal trial involving eleven defendants might lend itself to confusion in certain instances; but our examination of the record assures

us that the trial judge properly conducted the trial and insured the defendants' rights to a fair trial. The jury's task was a difficult one but we can find no reason for this Court to quarrel with the verdicts here.

Before concluding, we wish to express our appreciation to the trial judge who presided in this case. In all the annals concerning the application of criminal law in this state, there is seldom to be found a multi-party and complex criminal trial which has been conducted with such judicial restraint, patience, and excellent legal discrimination as that reflected in this enormous record. What has been done here in the trial court is, indeed, a lasting tribute to the trial judiciary of this state.

The judgments of the trial court are, in all respects, affirmed. The costs of this appeal are assessed against the plaintiffs in error.

BURNETT, CHIEF JUSTICE, and DYER and CHATTIN, JUSTICES, concur.

HUMPHREYS, JUSTICE, dissenting.

MR. JUSTICE HUMPHREYS (dissenting).

While I concur in the affirmance of the judgments against Hunter, Wright, Foster, Huston and Benton, against whom there is direct evidence of guilt, I am compelled to dissent to the affirmance of the judgments against Williams and Harris. I do this on the ground that there is no competent, legal evidence of their guilt of the crime of rape for which they were indicted and convicted.

Williams, sentenced to serve 99 years in the penitentiary, was not identified by either the white boys or the white girls. In fact, there was no evidence of any char-

acter that he was even present at the scene of the crime. Although he was placed in lineups which were viewed by all four of the occupants of the car, they were not able to identify him as being present at the scene, or to testify Williams was in any other way involved in the crime.

Williams' conviction depends for support upon two very ambiguous circumstances. The first of these circumstances is that during the commission of the crime, one of the participants was repeatedly referred to as "S. H.", and at the trial of the case Williams was referred to by witnesses as "Sonny Hooker". The last bare drop of justice has been wrung out of appellate hearings if this is to be accepted as a circumstance sufficient to support a 99-year conviction.

The second circumstance is that Williams stood mute when Green, Pearson and Wright implicated him in the crime, and admonished two of the other Negro boys who were there under arrest to "Keep your damned mouth shut."

This is all of the evidence against Williams. Upon this evidence, in spite of the fact the two white boys and the two white girls could not identify him in repeated lineups, which should have been considered in exoneration, as this fact is stronger than the circumstances, he has been sentenced to serve 99 years in the state penitentiary.

Even if the evidence upon which these two circumstances rest was legally admissible, I respectfully submit that it is insufficient in weight and substance to justify and sustain a conviction and sentence of 99 years in the state penitentiary.

For reasons which will be later discussed, it is clear the evidence upon which the second circumstance is based was not legally admissible, and should have been excluded by the Trial Judge upon objection.

Defendant Harris was sentenced to death in the electric chair. *He was sentenced to death in the electric chair in spite of the fact that there was no eyewitness who testified he was at the scene of the crime, or testified he had anything to do with the commission of the crime,* after he had been viewed in lineups by the boys and girls in the car and they had been able to identify him on two ambiguous circumstances that would not ordinarily sustain a conviction for stealing a package of cigarettes.

Harris was sentenced to death on two circumstances. The first of these circumstances is that he stood silent when Green, Pearson and Wright gave statements implicating him.

The second circumstance is that, although Harris seemed somewhat at ease when arrested, when he was taken into the room where the Negro boys were being assembled, his body stiffened and he exclaimed: "Oh my God."

Upon these two circumstances, Harris has been sentenced to death. No eyewitnesses. No direct evidence. Just two ambiguous circumstances. Yet, incredible as it seems, upon this evidence alone, *Harris has been sentenced to death.*

I respectfully submit that these two circumstances do not sustain the judgment against Harris, and that the evidence upon which the last circumstance depends is illegal and inadmissible.

The evidence with respect to the circumstance of silence should have been excluded by the Trial Judge upon objection. Instead, the Trial Judge allowed this evidence to go to the jury, under a rule to the effect that if a statement is made out of Court in the presence of the accused, containing an accusation or assertion of fact, which the accused party would be expected to deny if untrue, the failure to deny is circumstantial evidence and may warrant an inference of the truth of the statement. This rule is discussed in the majority opinion on pages 694 and 695.

However, it is clear that, since the holding of the Supreme Court of the United States in *Escobedo v. State of Illinois*, 378 U.S. 478, 84 S.Ct. 1758, 12 L.Ed.2d 977, the circumstance of silence is not ordinarily admissible for this purpose. One of the clearest propositions made in *Escobedo* is that it is the duty of the law enforcement officers, after taking the person into custody, prior to any questioning, *to warn him that he has the right to remain silent. Escobedo* refers to this as a procedural safeguard which must be complied with or else the judgment will be unconstitutional and void.

This Court, in *Lanier v. State,* 219 Tenn. 417, 410 S.W.2d 411, in an opinion by Chief Justice Burnett, recognized this holding of *Escobedo* and, without summarizing the facts which are fully stated in that opinion, held:

"When statements which tend to incriminate him are made to the accused and used against him when he does not reply thereto under our authorities his failure to deny is admissible as evidence of his acquiescence in the truth of the statement. (citing case) But the

*Camper* case and such authority is not controlling on the point when one's constitutional rights have been violated."

This opinion then refers to and quotes from *Escobedo* on the proposition of the right to remain silent, and the duty of arresting officers to advise a defendant or a prisoner of this right.

Citing *Escobedo* and quoting from it, this Court reversed and remanded the case for a new trial.

If *Escobedo* invalidated the "circumstance of silence" in the *Lanier* case, because the facts in regard thereto transpired prior to the warning required, then *Escobedo* more strongly invalidates and makes illegal and unconstitutional the "circumstance of silence" with respect to the Defendants Williams and Harris, *because in each instant, each of the Defendants was warned immediately upon his arrest of his constitutional right to remain silent, so that when he stood mute he was simply exercising the constitutional right outlined in Escobedo, and which he had been told on arrest he had the right to exercise.*

If *Escobedo* does not have the effect of invalidating the "circumstance of silence" after the warning of the right to remain silent, just as fully and to the same extent that it invalidates the "circumstance of silence" prior to the warning (*Lanier v. State,* supra), then a defendant's constitutional right is not only rendered to this extent useless, *but the warning actually becomes a trap. A trap, because in reliance on the constitutional right to remain silent, a defendant may stand mute, and yet the State can prove this circumstance of silence against him as a basis for a conviction.* This would be a legal outrage.

To state the proposition more concretely: If Williams and Harris were constitutionally entitled to the warning that they had a right to stand mute, and in keeping with this constitutional right they were warned that they had the right to stand mute, then in reliance on the constitutional right they did stand mute, the State ought not be permitted to prove this as a circumstance of guilt.

Finally, regardless of legality, the circumstance of silence as a basis for a death sentence and a 99-year conviction, is, in the present case, ridiculous, since Green and Pearson, before whom Williams and Harris were said to have stood mute, were turned loose (Green by the jury and Pearson by nolle prosequi), in spite of their confessions, while Williams and Harris, who did nothing but stand silent as they had a constitutional right to do, were sent to the electric chair and to serve 99 years.

But, the acquittal of these two, Green and Pearson, was in keeping with the confusion which marked the progress of this case. For, while applying the circumstance of silence to sentence Harris and Williams to death in the electric chair and 99 years in the penitentiary, turning loose Green and Pearson, who confessed their guilt, the jury also turned loose a defendant by the name of Marshall, who was identified by one of the State's witnesses as being at the scene of the crime and as participating therein.

Such results point up the fairness of Harris' and Williams' requests for severance and separate trials and the prejudice to them of the denial of this request.

I have not discussed my feeling that the use of confessions in this joint trial was contrary to *Bruton v. United States*, 391 U.S. 123, 88 S.Ct. 1620, 20 L.Ed.2d

476; *Roberts v. Russell,* 392 U.S. 293, 88 S.Ct. 1921, 20 L.Ed.2d 1100; and *Bujese v. United States,* 392 U.S. 297, 88 S.Ct. 2064, 20 L.Ed.2d 1113, because this case will unquestionably go to the United States Supreme Court and that Court is in far better position to interpret and apply its own opinions than am I. If the Bruton rule is to be developed beyond a bare Sixth Amendment confrontation holding, to a holding of due process denial because there can be no fair hearing or trial where this sort of procedure is indulged, it must be by that Court. However, for myself, I think the rule should be so extended.

Nor, have I discussed the application of *Witherspoon v. State of Illinois,* 391 U.S. 510, 88 S.Ct. 1770, 20 L.Ed.2d 776, because the voir dire proceedings, at which it is now alleged the jury was illegally scrupled with respect to the application of the death penalty, is not before this Court. The Attorney General rightfully takes the position that this voir dire record can only be brought to the Court's attention by the post-conviction precedure provided by Title 40, Chapter 38, Tennessee Code Annotated. However, I am compelled to state that the Post-Conviction Remedy Law falls grievously short of its purpose in its failure to let this Court examine the causes for which a defendant can have a post-conviction remedy, and in requiring that the whole case go back and be retried again with respect to the post-conviction remedy defect, before this Court can pass on the question raised. The result of this short-coming in the law is that there will always be two trials with respect to any matter which is subject to remedy by the post-conviction law, instead of one, unless the Legislature makes some provision for an appellate court to consider the matters which might be raised under the post-conviction remedy law.

My many years of service at the Bar and on the Bench of this State have convinced me that law and order are best served when punishment for crime is swift and certain. But, these same years of service have also convinced me that over and above everything else is the single overriding requirement of justice under law, and in this case, it is simply not just or legal that Harris be sentenced to death in the electric chair and Williams be sentenced to 99 years in the penitentiary on the illegal, ambiguous unconstitutional circumstantial evidence relied on by the State for this purpose. I would reverse the judgments against Harris and Williams and remand for a new trial.

Opinion on Petitions to Rehear

MR. JUSTICE CRESON.

Petitions to rehear have been filed. In essence, they complain that certain points made have been overlooked. The multiple briefs, oral arguments and opinions of this Court simply emasculate the suggestion that anything has been overlooked in this cause. All of the points made and authorities cited have been considered thoughtfully, and at length.

The petitions to rehear are denied.

BURNETT, CHIEF JUSTICE, and DYER and CHATTIN, JUSTICES, concur.

HUMPHREYS, JUSTICE, dissenting.